

**SIGNED this 21st day of September, 2012.**

_____
LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE
_____

# United States Bankruptcy Court

**Western District of Texas**
**San Antonio Division**

| | |
|---|---|
| IN RE<br><br>SUPERIOR TOMATO-AVOCADO, LTD.<br><br>*DEBTOR* | BANKR. CASE NO.<br><br>12-50074<br><br>CHAPTER 11 |

### MEMORANDUM DECISION ON OBJECTION TO PACA TRUST CLAIM

This is a dispute over the allowance of a claim filed pursuant to the trust provisions of the Perishable Agricultural Commodities Act (PACA).[1] There is no dispute that the creditor is owed

---

[1] *See* 7 U.S.C. § 499a *et seq*. The relevant portion of the Act, wherein the trust is created and where compliance is spelled out, is set out here:

> c) Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents; preservation of trust; jurisdiction of courts.
> (1) It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such

money. The dispute focuses on whether the creditor's claim qualifies for payment out of the PACA "trusts" held by these bankruptcy estates,[5] by virtue of its claimed status as a "trust claim" under PACA. The court-appointed special PACA counsel[6] objected to the claim on grounds that

---

commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), and its members.

(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

(4) In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.".

(5) The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust.

7 U.S.C. § 499e(c) (as amended by P.L. 104-48, §§ 6, 8(b), 109 Stat. 427-429 (Nov. 15, 1995)).

[5] The estate holds legal title to these trusts, and acts as trustee over the trusts, not only pursuant to section 541 of the Bankruptcy Code but also pursuant to section 499e(c) of title 7. However, the beneficial interest in the trusts is held by the PACA Trust Claimants. *See In re Kornblum & Co.*, 81 F.3d 280, 285-86 (2nd Cir. 1996).

[6] *See* Doc. # 31. A number of civil actions were pending in federal district court prior to this bankruptcy filing. The district court transferred all of these matters to this court, which in turn entered an order setting up a claims

the filing did not comply with the requirements of PACA, so that it did not qualify for priority of treatment. The creditor claims substantial compliance, and argues that, under the case law, that is all that is required.

## Facts

Superior Tomato-Avocado, Ltd. is a produce company, dealing mainly with tomatoes and avocados. It is a major supplier to grocery stores throughout Texas. Superior filed a Voluntary Petition under Chapter 11 on January 3, 2012. Prior to the bankruptcy, A&A Concepts, LLC sold produce to Superior, for which it was still owed $150,595.88. A&A filed a Perishable Agricultural Commodities Act trust claim against Superior following the Chapter 11 filing, in accordance with the claims procedures order. On March 22, 2012, Special Counsel for Superior filed objections to A&A's claim on the basis that A&A, as a non-PACA licensee, had failed to preserve its PACA trust rights in the manner required by the statute because it did not give Superior a separate timely written notice of intent.[7]

During the entire period in which A&A shipped and billed Superior for the produce that is the subject of this claim, A&A was not licensed by the U.S. Department of Agriculture as a PACA licensee. Nonetheless, A&A's invoices included dates, prices, subtotals, and other basic necessary information about what was shipped, when it was shipped, and what it cost. What is more, the invoices contained the sort of notice that *licensed* producers are entitled to use, but non-licensed users are not.[8] As a non-licensee, A&A was required to send a *separate* notice

---

resolution process to resolve all PACA claims. The order appointed special counsel to review claims and to object when necessary. The procedure has proven to be cost effective, inuring to the benefit of the PACA Trust Claimants.

[7] The PACA statute contains a safe harbor for licensed producers, relieving them of this duty. *See* 7 U.S.C. § 499e(c)(4). Non-licensed producers must comply with subsection (c)(3), which imposes the separate notice obligation.

[8] *See* 7 U.S.C. § 499e(c)(4). The notice reads: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these

3

containing the information set out in 7 U.S.C. 499e(c)(*3*). A&A sent a generic statement of account, a sheet entitled "NOTICE OF INTENT TO PRESERVE PACA TRUST BENEFITS," and about 100 invoices. The debtor's special counsel says this "notice" package does not comply with subparagraph (3) so the claim should not be allowed as a PACA claim. The claimant counters that it "substantially complies" and that is all that the law requires.

A hearing on the objection was held, and all parties had a full opportunity to present relevant evidence and to make their arguments. This decision now resolves the question presented.

## **Legal Analysis**

The idea of creating a trust for agricultural producers arose out of the Depression. The concern was that producers had little or no way to protect themselves from catastrophic loss when the buyer got into financial difficulties. Lenders, by contrast, could protect themselves with liens – usually without the producers ever realizing that the buyer's assets were no longer available to satisfy their claims. The PACA trust device helped to correct the inequity by giving the sellers a trust that took precedence over the claims of secured creditors. *In re Arctic Exp., Inc.*, 636 F.3d 781, 799 (6th Cir. 2011) (citing *Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003)). Chief among the remedies created by PACA is this provision: "immediately upon delivery of the produce, a nonsegregated 'floating' trust [arises] in favor of unpaid sellers, which attaches to the products themselves and any proceeds." *Bocchi Americas Associates Inc. v. Commerce Fresh Marketing Inc.*, 515 F.3d 383, 388 (5th Cir. 2008). If the seller is not paid, the seller has a "superpriority" right that trumps the rights of a buyer's other

---

commodities until fully payment is received." Non-licensed producers, to obtain the benefits of the PACA trust, must give a separate written notice of intent to preserve the benefits of the trust within a specified time frame. *See* 7 U.S.C. § 499e(c)(3). In 1995, Congress added the special safe harbor now found in subsection (4), permitting the trust intent to be set out on the invoice itself, without having to send a separate notice within a specific time frame. Still, a producer does not *have* to be licensed for purposes of becoming a beneficiary of the trust. Licensing simply confers a procedural advantage.

secured and unsecured creditors. *Id*. Indeed, the right is more than a mere priority, because the estate is deemed to hold only a bare legal interest in the trust so created. *See In re Korblum & Co.*, 81 F.3d 280 (2nd Cir. 1996). The remedy is thus both powerful and valuable.

In order for a producer to take advantage of these remedies, however, PACA sets out certain requirements by which sellers must abide, one of which is that the seller must give written notice of their intent to preserve a trust claim. 7 U.S.C. § 499e(c)(3). The requirements relevant to the issue before the court revolve around the seller's duty to give the buyer notice to preserve the benefits of the trust. The relevant parts state:

> **(3)** The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days
> (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary,
> (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or
> (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored.
>
> The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

7 U.S.C. § 499e(c)(3). As earlier noted, had A&A been a licensee, then its preprinted notice on the bottom of its invoices would have been sufficient. *See* 7 U.S.C § 499e(c)(4). But A&A never bothered to become a licensee. Thus, the notice language on the bottom of the invoices, standing alone, does A&A no good whatsoever. A&A has to have complied with subsection (c)(3) in order qualify as a claimant against the trust.

If the statutory requirement set out in subsection (c)(3) is interpreted strictly, then A&A indeed did fail to comply with PACA's notice requirements. If the PACA guidelines are read as requiring only "substantial compliance," however, then A&A's notification efforts would pass muster, substantially meeting the PACA requirements, as the inclusion of statutory language on the invoice, coupled with their being attached to a document entitled "NOTICE OF INTENT TO PRESERVE PACA TRUST BENEFITS," would give "written notice of intent to preserve the benefits of the trust" and would "set forth information in sufficient detail to identify the transaction subject to the trust." 7 U.S.C. § 499e(c)(3). Unfortunately, courts are split on whether compliance with the notice requirements of PACA must be strict or merely substantial.

Only one Fifth Circuit decision has addressed the strict versus substantial compliance issue, and unfortunately does not clearly endorse either approach. The court ruled that strict compliance was required in the case before it, but then specifically limited its holding to the facts of the case. As it turned out there was a contract between the parties, which expressly provided that strict compliance with regulations was required. *Interstate Contracting Corp v. City of Dallas, Tex.,* 407 F.3d 708, 727 (5th Cir. 2005). Thus, we only know that the court was committed to a strict construction of a written contract. We have no indication whether strict compliance with the statute's directive would be required absent such a contractual provision.

A lower court case within the circuit, *Ruby Robinson Co., Inc. v. Kalil Fresh Marketing, Inc.*, 2009 WL 3378419, at *7 (S.D. Tex. 2009), acknowledged the split of authority in the case law, but declined to pick a side, because the seller had not met even the lower standard.

The weight of authority as well as the current trend in the case law around the country both tip in favor of the substantial compliance standard. *In re W.L. Bradley Co., Inc.,* 75 B.R. 505, 511–12 (Bankr. E.D.Pa. 1987) (Allowing substantial compliance furthers industry wide

efficiency with little to no practical side effects, while conversely, if the notice requirement was construed strictly, it may "have some practical, industry-wide significance."); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777 (8th Cir. 1991) (Requiring strict compliance with the regulation would thwart the remedial nature of the statute.); *In re Carlton Fruit Co., Inc.,* 84 B.R. 810, 812 (Bankr. M.D.Fla. 1988); *In re Lombardo Fruit and Produce Co.,* 107 B.R. 654 (Bankr. E.D.Mo. 1989); *Atlantic Coast Produce, Inc. v. McDonald Farms, Inc.,* 2005 WL 1785137, at *1–2 (W.D. Va. 2005) (permitting substantial compliance with statutory text); *Food Authority, Inc. v. Sweet & Savory Fine Foods, Inc.*, 2011 WL 477714, at *3 (E.D.N.Y. 2011) (unpublished opinion). Courts favoring substantial compliance cite the general congressional intent to protect produce sellers, and thus conclude that the notice requirements should be liberally constructed in favor of produce sellers in order to align with legislative intent. *Hull Co.*, 924 F.2d at 783; *In re W.L. Bradley Co., Inc.,* 75 B.R. at 511–12 ("the general legislative intent to establish increased protection and an effective remedy for sellers, suppliers and agents.").

A more relaxed compliance standard means that more producer creditor claims would qualify for the *de facto* priority that the PACA trust provisions confer. To answer the charge that priorities in the Code are normally strictly and narrowly construed (because they run counter to the Code's underlying purpose of achieving equality of distribution), courts subscribing to the majority rule point to the legislative history to section 541, which they maintain demonstrates that PACA is in fact *not* inconsistent with the Bankruptcy Code or its underlying policy. Said one court: "Indeed, the legislative history of 541(a), which defines the property of the bankruptcy estate, provides that '[n]either this section nor section 545 will affect various statutory provisions that . . . create [ ] a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act section 206, 7 USC Section 196.' H.R.Rep. No. 95–595, 95th Cong., 1st Sess.

7

367–8 (1977); S.REP. NO. 95–989, 95th Cong., 2d Sess. 82–3 (1978), U.S.CODE CONG. & ADMIN.NEWS 1978, pp. 5787, 5868, 6324." *In re Richmond Produce Co., Inc.*, 112 B.R. 364, 373 (Bankr. N.D.Cal. 1990), *overruled on other grounds*, *Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*, 307 F.3d 1220 (9th Cir. 2002). The *Richmond Produce* court also noted that the "substantial compliance" standard was more consistent with PACA's purpose. *Id.*, at 373. PACA's language supports substantial compliance because the only *express* requirement concerning notice is that the notice state the claimant's intent to preserve the benefits of the trust. *Id.*; *see generally Produce Alliance v. Let-Us Produce*, 776 F.Supp.2d 197, 203-04 (E.D. Va. 2011) (discussing PACA's limited express requirements); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 783 (8th Cir. 1991).

The minority of courts favoring strict compliance have done so with two arguments. The first says that PACA is in conflict with the fundamental goals of the Bankruptcy Code and as a result, PACA requirements must be construed narrowly or strictly when such claims are asserted in a bankruptcy court. Goes the argument, PACA asserts themes and regulations that stand in direct opposition to the fundamental functions of the Bankruptcy Code, which is to assure a *pro rata* distribution with a minimum of special priorities for otherwise similarly entitled creditors. Thus, produce seller-creditors should only receive the special PACA protections if they specifically follow PACA's requirements, and those requirements should be strictly construed. *See In re Chipwich, Inc.*, 165 B.R. 135 (Bkrtcy. S.D.N.Y. 1994) ("PACA's trust provisions give greatly enhanced protection to sellers of perishable agricultural commodities that are unavailable to other creditors, but such protection is incompatible with one of the fundamental objectives of the Bankruptcy Code, which is to provide equal treatment to similarly situated creditors." (citing *Clarke v. Rogers,* 228 U.S. 534, 544, 33 S.Ct. 587 (1913) (stating that "the fundamental purpose

of the Bankruptcy Law . . . is equality between creditors")); *In re D.K.M.B., Inc.,* 95 B.R. 774 (Bankr. D.Colo. 1989) ("importance of the Congressional intent behind the Bankruptcy Code, which is to provide an orderly, fair and equitable distribution of a debtor's assets among its creditors. The application of the 1984 PACA amendments in this case would effectively prevent the equitable distribution of debtor's assets among its creditors."); *but cf. In re San Joaquin Food Service, Inc.,* 958 F.2d 938, 940 (9th Cir. 1992) (requiring strict compliance with PACA's statutory text, but suggesting that substantial compliance with its implementing regulations suffices).

The minority position in favor of strict compliance fails on two grounds. First, as the *Richmond Produce* court accurately noted, Congress explained that neither section 541 nor 545 are intended to affect other statutory provisions that create a trust for the benefit of a creditor, such as the Packers and Stockyards Act and the Perishable Agricultural Commodities Act.[9] *See In re Fresh Approach, Inc*., 51 B.R. 412, 419 (Bankr. N.D. Tex. 1985).

Secondly, even if PACA were in conflict with the Bankruptcy Code, PACA would still function as the controlling statute, for two reasons. A specific statute usually controls over a general one, without regard to priority of enactment. *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). PACA provides a special remedy for a specific class of creditors when there is not enough money to go around, while the Bankruptcy Code affords a more general remedy for that sort of situation. *See Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003). PACA is the more specific statute, and so emerges as the controlling law. Further, the earlier enacted law generally yields to the more

---

[9] The legislative history of 541 states: "Neither this section [541] nor section 545 will affect various statutory provisions that give a creditor a lien that is valid both inside and outside bankruptcy against a bona fide purchaser of property from the debtor, or that creates a trust fund for the benefit of creditors meeting similar criteria. " *See* Packers and Stockyards Act § 206, 7 U.S.C. 196 (1976).

recently enacted one. *Quinn v. Gates,* 575 F.3d 651, 655 (7th Cir. 2009) (finding that "[t]o the extent of incompatibility, an old rule generally yields to a new one"). PACA was first enacted in 1930, but Congress amended PACA in 1984 to include the statutory trust for the protection of unpaid sellers.[10] It was amended again, in 1995, to add the special protection for licensed producers, making it even easier for producers to claim their priority.[11] The present text of Title 11, commonly referred to as the Bankruptcy Code, was enacted in 1978, and while Congress made "numerous technical changes to the Code in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 380," none of those changes are relevant to this decision. *Kelly v. Robinson*, 479 U.S. 36, 44, 107 S. Ct. 353, 358 (1986). PACA, as the later statute, takes precedence in the event of a conflict.

The minority view also supports strict compliance with the observation that the language of PACA § 499e(c)(3) is unambiguous and must therefore be construed strictly in conjunction with the necessary USDA notice regulations. *In re Marvin Properties, Inc.,* 854 F.2d 1183 (9th Cir. 1988) (The language of § 499e(c)(3) is unambiguous on its face. The same is true of USDA notice regulations, and both must be followed in strict compliance.); *Hintz & Reiman, Inc. v. J&J Produce,* 2006 WL 709106 (S.D.N.Y. 2006) (unpublished opinion); *see also* 7 CFR 46.46(f);[12]

---

[10] 7 U.S.C. 499a; Perishable Agricultural Commodities Act, 1930, act June 10, 1930, ch. 436, 46 Stat. 531; Pub. L. 98-273, Sec. 1, May 7, 1984, 98 Stat. 165.

[11] *See* 7 U.S.C. § 499e(c)(4), P.L. 104-48, §§ 6, 8(b), 109 Stat. 427, 429 (Nov. 15, 1995).

[12] Here is the relevant language of the regulation:
> (f) Filing notice of intent to preserve trust benefits.
> (1) Notice of intent to preserve benefits under the trust must be in writing, must include the statement that it is a notice of intent to preserve trust benefits and must include information which establishes for each shipment:
>> (i) The names and addresses of the trust beneficiary, seller-supplier, commission merchant, or agent and the debtor, as applicable,
>> (ii) The date of the transaction, commodity, invoice price, and terms of payment (if appropriate),
>> (iii) The date of receipt of notice that a payment instrument has been dishonored (if appropriate), and
>> (iv) The amount past due and unpaid.

7 C.F.R. 46.46(f)(1) (2012).

*see generally Chevron, U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) (announcing the general rule that courts are to defer to the statutory construction of the agency that administers the statute, if that construction is permissible). However, PACA itself does not direct the USDA to enact regulations as to the contents of the notice. Even were there such regulations, the court is not required to give them the same level of deference that they would otherwise have had those regulations been promulgated under compulsion of law. *Onslow County, N.C. v. U.S. Dept. of Labor*, 774 F.2d 607, 611 (1985); *see also United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, (1978). Finally, the regulation does not actually *interpret* the statute so much as it *regurgitates* the statute's words. *Chevron* deference (thank goodness) applies only to the former, and not to the latter.

The court concludes the majority rule is the correct one. Thus, A&A was only required to substantially comply with section 499e(c)(3) in order to satisfy that provision's notice directive. A&A substantially followed a set guidelines set forth by the PACA, providing Superior sufficient notice that A&A intended to preserve its rights to bring a PACA trust claim. The clear statement regarding intent, coupled with attaching the specific invoices with respect to which it claimed a trust, is sufficient to meet the requirements set out in section 499e(c)(3).

The parties announced on the record that only a portion of the claim is entitled to trust treatment, because some of the invoices fell outside the notice window. The court's ruling here ratifies the agreement of the parties with regard to that portion of the claim to which the parties had previously agreed did not qualify for the trust for reasons other than the substantial compliance issue the subject of this decision.

Accordingly, Superior Tomato and Avocado, Ltd's Objection to PACA Trust Claim of A&A Concepts, LLC is hereby DENIED. A separate order will be entered regarding the claim of A&A, consistent with this decision.

# # #